UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re:

EDWARD SOROKINE

    Debtor,

Case No. 09-40396399
Chapter 7

## COMPLAINT

COMES NOW Creditor Svetlanna Kravtchouk ("Kravtchouk"), by and through her undersigned attorney, and for her Complaint, states as follows:

Procedural Posture

1. Debtor Edward Sorokine filed his Chapter 7 Voluntary Petition ("Petition") on January 20, 2009. Document #1.

2. Debtor Sorokine's Petition lists Creditor Kravtchouk as having a secured claim on the property located at 10417 Willowdale Drive, St. Louis, Missouri. Document #1 at 13.

3. Debtor Sorokine was granted a discharge order on April 15, 2009 and a final decree granting that discharge was entered on April 27, 2009. Document 12 and 14.

4. Debtor Edward Sorokine filed a Motion to Reopen this bankruptcy case on March 29, 2021 pursuant to Fed. R. Bankr.P. 5010 and 11 U.S.C. § § 350(b)  Document #15.

5. This Court granted Debtor Sorokine's Motion to Reopen the case on March 30, 2021. Document #16.

1

6. This Court ordered Creditor Kravtchouk to file a complaint under § 523(a) by May 25, 2021. Document #21.

Facts

1. In or around January of 2001, Plaintiff Svetlana Kravtchouk and Defendant Edward Sorokine founded Western Group Development, Inc. ("Western Group") was in the business of real estate buying, selling and managing. The venture was memorialized in the attached Shareholder Agreement in December of 2003, granting each a 50% stake in the company. Plaintiff Kravtchouk was the primary financier for the venture, with at least $ 172,000.00 investment. See Exhibit A, Recorded Documents - Shareholder Agreement.

2. Western Group Development, Inc. has never been terminated.

3. At the time, the two had developed a romantic relationship. Plaintiff Kravtchouk was going through a divorce from her professional athlete ex-husband. She further spoke only a small amount of English. Defendant Sorokine wrote the shareholder's agreement.

4. The shareholder's agreement indicates that:

   The one exception to his granted powers is outlined above regarding obligating the Corporation to any debt beyond the debt owed by the Corporation to S. Kravtchouk.

5. Defendant Sorokine's broadly enumerated powers to control the corporation were only limited by the fact that he couldn't unilaterally extend the corporations debt beyond the amount Plaintiff Kravtchouk had contributed, because she was the sole financier for the operation.

6. The January 2001 Shareholder Agreement was subsequently recorded by the St. Louis County Recorder of Deeds, Book 17645 Page 577 as a lien on the property located at 10417 Willowdale Drive.

7. Towards the end of 2001, Plaintiff Kravtchouk and Defendant Sorokine took a trip to Las Vegas. There, Defendant Sorokin and her got into an argument. Defendnat Sorokine in anger beat Plaintiff Kravtchouk. Defendant Sorokine broke Plaintiff Kravchouk's nose. This unexpected violence scared Plaintiff Kravchouk dearly. Defendant Sorokine and his mother begged Plaintiff Kravchouk to not press charges the next day. Both made it apparent Plaintiff Kravtchouk that would be retaliated against if she did.

8. By 2007, Plaintiff Kravtchouk and Defendant Sorokine's romantic relationship had ended. And Western Group begin to deteriorate. In all, PlaintiffWhen Defendant Sorokine sought to purchase the property located at 10417 Willowdale Drive for his personal residence around February of 2007, Western Group Inc. did not have sufficient money to finance it.

9. Defendant Sorokine around that time solicited Plaintiff Kravtchouk for an additional investment as purchase money for the Willowdale Property. In February 2007, Plaintiff Kravtchouk and Defendant Sorokine entered into a Promissory Note granting Plaintiff Kravtchouk an secured by the Willowdale property equivalent to the entire amount of her debt. The money was used towards the purchase of the property. See Promissory Note, Exhibit A.

10. The shareholder agreement and all subsequent notes memorializing any obligation on behalf of Mr. Sorokine to Plaintiff Kravtchouk was secured by the property as a purchase money.

11. Defendant Sorokine did not have enough to purchase the Willowdale Drive property. But he was able to purchase it because Plaintiff Kravtchouk loaned him the money.

12. The February 2007 Note indicated:

    In the event of the sale of the property at 10417 Willowdale Drive, any proceeds left after paying off the existing mortgage/mortgages will be paid to Svetlanna Kravtchouk *towards the balance leftover* from the agreement of 12/30/03.

    Emphasis supplied. See Exhibit A, Recorded Documents – February 2007 Note.

13. The property at 10417 Willowdale Drive is described in Deed Book 11544 at Page 1203. The property is Bldg No. 19 Unit No. 10417 0.73049% in common elements.

14. The February 2007 Note was subsequently recorded in August by the St. Louis County Recorded of Deeds at Book 17645 Page 570.

15. The February 2007 Note indicated that the property located at 10417 Willowdale would secure the total amount of the outstanding debt, which at that time was $ 172,000.00. Upon sale of the home, the obligation to repay the debt would be triggered and the proceeds would fund a portion of the obligation.

16. In June of 2007, Plaintiff Kravtchouk and Defendant Sorokine entered into a second Promissory Note. See Exhibit C. The June 2007 Note memorialized an additional cash payment of $ 78,000.00 by Plaintiff Kravtchouk to Defendant Sorokine. The June 2007 Note stated that, in addition to obligating Defendant Sorokine to repay with interest the $ 78,000.00 loan, Defendant Sorokine would undertake an additional obligation. It stated: The existing Note from the Business Bank of St. Louis on 1630 Valley Oaks Estates Ct., St. Louis MO 63005 will be paid in full by Edward Sorokine of 10417 Willowdale Drive, St. Louis MO 63146 as the funds will be available to him. Exhibit D 080.

17. The Note referred to in the June 2007 Note was a First Deed of Trust undertaken by Defendant Sorokine as a part of the real estate venture established in the January 2001 Shareholder Agreement discussed above. Defendant Sorokine undertook this additional promise to provide additional assurance to Plaintiff Kravtchouk.

18. Thus the entire debt of more than $ 250,000.00 was secured by the 2007 Note granting Plaintiff Kravtchouk an interest in the Willowdale property. And the terms of the note indicated that the balance of which was to become due upon sale of that property.

19. Indeed, Defendant Sorokine made repeated assurances at the time that they entered into the agreement that the February 2007 Note was merely a floor for the amount of money he could guarantee to Plaintiff Kravtchouk. But Defendant Sorokine nevertheless undertook the Note to induce Plaintiff Kravtchouk to give him additional purchase money for the Willowdale Property.

20. By 2009, Western Group and Defendant Sorokine's finances were in shambles. Defendant Sorokine had gone so far in his execution of the elaborate powers he granted

himself in the Shareholder's agreement as to mortgage the home that Plaintiff Kravtchouk had purchased prior to their relationship. Defendant Sorokine went behind Plaintiff Kravtchouk's back to get a loan from the Buisness Bank of St. Louis on property he didn't own, using the broadly enumerated powers of the Shareholder Agreement without regard for Plaintiff Kravtchouk. He didn't tell her about that, and when he didn't make the payments, the Business Bank took possession of Plaintiff's property for around $ 200,00.00. One month later, it was sold to a different buyer for $ 280,000.00 and then two months subsequent, for nearly $ 400,000.00.

21. Contrary to the explicit terms of the Shareholder's Agreement, Defendant Sorokine had indebted the corporation and himself beyond the initial amount that Plaintiff Kravtchouk had committed. The mortgage of Plaintiff Kravtchouk's home where she and her young children lived had never been a part of any agreement between the two.

22. So Plaintiff Kravtchouk had no reason to be aware of the requirement for the payments on the second mortgage. Indeed, Defendant Sorokine had intentionally hidden the very existence of the second mortgage, apparently fearing reprisal. What is clear is that he had knowledge that what he did was wrong and violative of the Shareholder Agreement at the time that he made the deal.

23. When suit was filed to collect on the second mortgage, Plaintiff Kravtchouk learned that her business with Mr. Sorokine had failed. She learned that her entire initial investment in the Western Group would not be soon recouped. And she learned that she would be losing her home. Mr. Sorokine had taken out a loan on the property under the false

representation that he had a power of attorney granting him authority to do so, when in fact he did not. See Exhibit E.

24. Defendant Sorokine had taken money from a lender on a property that was not his, and used the money to make it appear as if SL Western Group still had solvency. His moving around of the funds was possibly criminal.

25. Indeed, Section 19(a)(1) of the Securities Act prohibits "use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, have employed devices, schemes or artifices to defraud." See 15 U.S.C. §77q(a)(1).

26. And, Sections 17(a)(2) and 17(a)(3) prohibits obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. See 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

27. Defendant Sorokine's criminal conduct was only prevented from being revealed by Plaintiff Kravtchouk. When she learned of his deceit, Defendant Sorokine begged her not to reveal his criminal enterprise. He repeatedly assured her that the entire value – as stipulated in the recorded documents – would be paid. And he insisted upon that fact until 2020, when he tried to sell the Willowdale property without informing Plaintiff.

28. Sorokine submitted a Voluntary Petition for Chapter 7 bankruptcy in January of 2009 in order to evade his creditors. See Exhibit B, Bankruptcy Petition.

29. Defendant Sorokine wanted to pay Plaintiff Kravtchouk back the money he took and he repeatedly told her and her children that.

30. Indeed, this was consistent with the Shareholder Agreement's express promise, written by Mr. Sorokine himself, and with all communications that occurred between Defendant Sorokine and Plaintiff Kravtchouk for the past 20 years.

31. Defendant Sorokine made repeated promises in addition to Plaintiff Kravtchouk's family that the entire amount would be repaid. He contacted her son I. in 2014 and son C. in 2015 and promised them that they would have the money back he so badly wished to repay them.

32. Indeed in 2018, Plaintiff Kravtchouk reached out again to Defendant Sorokine regarding the debt and told her that she would be entirely repaid, but that he needed more time for one of his business ventures to mature and pay it off.

33. But Defendant Sorokine did not mention at that time that he was considering listing the Willowdale Property. Instead, Plaintiff Kravtchouk discovered that to her surprise the property was being sold. Defendant Sorokine intended to sell the property at Willowdale but evade the remaining obligations he had repeatedly assured Plaintiff Kravtchouk would be repaid.

34. Plaintiff Kravtchouk discovered around June of 2020 that the Willowdale Property had fallen into disrepair as a result of the culpable neglect of Defendant Sorokine. As a result, the property was only listed for $ 117,000.00, far below the median price for condominiums in that area.

35. When Plaintiff Kravtchouk found that the property's asking price had been lowered, she realized that Defendant Sorokine was trying to scam her by selling the property on the cheap. Despite his repeated assurances to Plaintiff Kravtchouk that she would be repaid

in full, he was trying to get out on the cheap by transferring the property for less than its valu

### Debtor Sorokine's Debt to Creditor Kravtchouk is not discharged purusaunt to § 523(a)(3) Because Creditor Kravtchouk Did Not Have Notice of the Debts, and the Debts were not Listed or Scheduled

36. Debtor Sorokine indicates in his Motion for Contempt and to Enforce Discharge Injunction that Creditor Kravtchouk was "served by first class mail notice of the Meeting of Creditors and a copy of the order entered in Debtor's Chapter 7 Discharge Case" and did not file any pleadings opposing the discharge. Document 18, ¶ 11-13.

37. The Certificate of Notice for the Chapter 7 Meeting of Creditors indicates that the Meeting of Creditors Notice was sent on January 21, 2009 to *inter alia* Svetlanna Kravtchouk 5300 Lindley Avenue #103, Encino, CA 91316. Document 7.

38. The Certificate of Notice for the Discharge of the Debtor indicates that the Discharge was mailed on April 18, 2009 to *inter alia* Svetlana Kravtchouk 5300 Lindley Avenue #103, Encino, CA 91316. Document 13.

39. Section 523(a)(3) states an exception from discharge for a debt that was:

> neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit
>
> (A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, *unless such creditor had notice or actual knowledge of the case in time for such timely filing* ; or
> (B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, *unless such creditor had notice or actual notice of the case in time for such timely filing and request*.

9

11 U.S.C. § 523(a)(3) (2015).

40. As attested in the attached Affidavits of Svetlanna Kravtchouk and Affidavit of Elena Mikhailova, Creditor Kravtchouk did not have notice nor actual notice of the proceedings in Debtor Sorokine's 2009 claim.

41. Indeed, as identified by Creitor Kravtchouk in her Affidavit at ¶ 20-22, at the time of Debtor Sorokine's bankruptcy proceeding, she lived at 3855 N. Lupine Lane, and not the 5300 Lindley address identified in the mailing matrix. See Affidavit of Svetlana Kravtchouk, Attached as Exhibit A, ¶ 20-22.

42. In fact, as supplied in at Page 22 in the Affidavit of Svetlanna Kravtchouk, near the time of Debtor Sorokine's initial bankruptcy case Creditor Kravtchouk's child Chris was suspended by his school. The school sent the notice of suspension Creditor Kravtchouk's actual address, 3855 Lupine Avenue. See Exhibit A, p. 22 *et seq*.

43. Further, Creditor Kravtchouk did not have actual notice of the bankruptcy proceeding at that time.

44. In fact, Creditor Kravtchouk testifies in her Affidavit that she had no communications with Debtor Sorokine during the period of his bankruptcy. See Exhibit A, ¶ 23.

45. She further testifies that she did not communicate with him in part because of the history of abuse she had suffered at the hands of Defendant Sorokine, including physical abuse. See Exhibit A, ¶ 19.

46. Creditor Kravtchouk's testimony that she did not have notice nor actual notice of Debtor Sorokine's initial bankruptcy proceeding is further supported by the Affidavit of Elena Mikahilova, Attached to this Motion as Exhibit B.

47. Elena Mikhailova testifies via affidavit that she had provided assistance to Creditor Kravtchouk around the year 2007 to collect the debts owed by Debtor Sorokine, but had not had any success at that time. See Exhibit B, ¶ 8.

48. Elena Mikhailova further testifies as to the physical abuse suffered by Creditor Kravtchouk and to her actual fear in further support of the notion that Creditor Kravtchouk did not have notice of the initial bankruptcy proceeding.

<u>Debtor Sorokine's Debts to Creditor Kravtchouk are not Dischargeable Pursuant to 11 U.S.C. § 523(a)(2),(4) and (6)</u>

49. Debtor Sorokine's debts to Creditor Kravtchouk are not dischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and (6) because they fall within the enumerated exceptions as described below.

50. "Under Section 523(a)(2)(B), any debt obtained for money, property, services, or an extension, renewal, or refining of credit, to the extent obtained by use of a statement in writing" (i) that is materially false;(ii) respecting the debtor's or insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive will be excepted from discharge. *Hous. Auth. of St. Louis Cnty. v. Reed (In re Reed)*, No. 16-41315-705, at *4 (Bankr. E.D. Mo. Apr. 26, 2017).

51. The elements must be proven by a preponderance of the evidence. *Grogan v. Garner*, <u>498 U.S. 279, 286-87</u>, <u>111 S.Ct. 654, 659</u>, <u>112 L.Ed.2d 755</u> (1991). For purposes to Section 523(a)(2)(B), a statement is materially false if it "paints a substantially untruthful picture

11

of a [debtor's] financial condition by a misrepresentation information of the type which would normally affect the decision to grant credit." *In re Bohr*, 271 B.R. 162, 167 (Bankr. W.D. Mo. 2001) (citation omitted). *Hous. Auth. of St. Louis Cnty. v. Reed (In re Reed)*, No. 16-41315-705, at *4-5 (Bankr. E.D. Mo. Apr. 26, 2017.

52. As alleged by Creditor Kravtchouk and the Affidavits Elena Mikhailova and Michael Vigdorchik, and as will be proven by additional testimony and evidence obtained during discovery, Debtor Sorokine obtained the entire amount of his debt to Creditor Kravtchouk by misrepresenting his authority to take out debts in Creditor Kravtchouk's name or with her guaranty or security. Debtor Sorokine did not have authority to encumber Creditor Kravtchouk's assets nor to bind her to the various promissory agreements Debtor Sorokine entered into while running his business. The representation that he did was false.

53. One such example of the patent falsity of Debtor Sorokine's debt is attached to this Complaint as Exhibit D. This document shows Debtor Sorokine modifying a mortgage on property that Creditor Kravtchouk owned, and Debtor Sorokine forging Creditor Kravtchouk's name while indicating that he has a "POA" that gave him authority to do so. But Debtor Sorokine did not have such authority.

54. Debtor Sorokine entered into innumerable other such similar mortgage and financing agreements.

55. "Defalcation while acting in a fiduciary capacity " under § 523(a)(4), does not require the proof of fraudulent, willful and malicious conduct. The terms fraud and defalcation are compared at 4 *Collier Bankruptcy Practice Guide* ¶ 76.07(1) (1989):

> "The term "fraud" clearly means positive fraud, fraud in fact, involving moral turpitude or intentional wrong. The term "defalcation," however, is construed to include liability arising through negligence, mistake or innocent default. The fiduciary is held to objective standards even though laboring under subjective limitations, and he is chargeable with knowledge of the rules which forbid him to make certain expenditures even though he did not know of them."

56. Thus as discussed in *In re Byrd*, 15 B.R. 154, 156 (Bankr.E.D.Va. 1981), when a liability is created by defalcation the Court needs only to consider two questions to determine whether the debt Sorokine owes Kravtchouk is nondischargeable. First, it must determine whether the debts arose while Sorokine was acting in a fiduciary capacity. A statute or other state law rule may create fiduciary status which is cognizable in bankruptcy proceedings. *In re Long*, 774 F.2d 875, 878 (8th Cir. 1985). Second, if Sorokine was acting in a fiduciary capacity, the Court must determine whether the debts occurred by fraud, defalcation, embezzlement, or misappropriation. If the debts were incurred as a result of defalcation it isn't necessary to consider whether the debtor's conduct was fraudulent, willful and malicious. Liability for defalcation can arise out of conduct which is based on simple negligence, mistake, or innocent default of one's duties. *See, In re Holman*, 42 B.R. 848, 850 (Bankr.E.D.Mo. 1984).*In re Wilson*, 127 B.R. 440, 443 (Bankr. E.D. Mo. 1991)

57. A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, or it may arise as a result of the special circumstance of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the other. *Shervin v. Huntleigh Sec. Corp.*, 85 S.W.3d 737, 740-41. (Mo. App. E.D. 2002). The

question in determining whether a fiduciary or confidential relationship exists is whether or not trust is reposed with respect to property or business affairs of the other. *Id*. at 741.

58. The Shareholders Agreement specifically indicates at Exhibit D 077 that the "total amount of [Creditor Kravtchouk's] debt is due and payable" within 7 days of the Corporation going out of business. In addition, the parties relationship as implicated by the Shareholder's Agremeent was one in which Debtor Sorokine had an explicit obligation to account to Creditor Kravtchouk regarding money spent, which never occurred.

59. Debts arising from willful and malicious injury by a debtor are excepted from discharge under Section 523(a)(6). 11 U.S.C. § 523(a)(6) (2009). Willfulness and maliciousness are two distinct elements of Section 523(a)(6). *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008) *citing In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999), *cert. denied*, 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999). The Eighth Circuit Court of Appeals has set a high bar for certainty of harm regarding wilful and maliciousness for the purposes of Section 523(a)(6). *In re Adams*, 349 B.R. 199, 203 (Bankr. W.D. Mo. 2006) *citing In re Hartley*, 869 F.2d 394 (8th Cir. 1989) (citations omitted). To prove wilfulness, the creditor must show by a preponderance of the evidence that debtor intended the injury, not just a deliberate or intentional act leading to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *Grogan v. Garner*, 498 U.S. 279, 280, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991). *In re Rodenbaugh*, 431 B.R. 473, 477 (Bankr. E.D. Mo. 2010).

60. Debtor Sorokine had a fiduciary duty to Creditor Kravtchouk under both his obligations to her under the Shareholder Agreement, under which he continued to obtain loans, as well as in the context of their ongoing business relationship.

61. Debtor Sorokine's debt accrued over a period of about 6 years, commencing with the execution of the Shareholder's Agreement. See Exhibit A, p. 6.

62. Debtor's Sorokine's debt to Creditor Kravtchouk occurred as the result of years of larceny and embezzlement of Creditor Kravtchouk's funds to finance his real estate business. Debtor Sorokine routinely entered into loans in Creditor Kravtchouk's name without the authority to do so, causing her serious financial injury.

63. Debtor Sorokine's scheme involved using the Shareholder Agreement together with numerous, forged Commercial Guarantees to obtain bank financing to purchase real estate on the basis of credit secured by Creditor Kravtchouk's property.

64. Creditor Kravtchouk testifies in detail about the documents falsely granting her assent in her testimony, including at ¶ 2,4, 16 and 24.

65. In particular addition, at ¶ 8 and 15 Creditor Kravtchouk indicates that the property located at 16307 Valley Oak Estates was mortgaged for the initial investment in the shareholder agreement, and subsequently mortgaged again by Debtor Sorokine and without Creditor Kravtchouk's consent for $179,798 in 2006.

66. When Creditor Kravtchouk discovered that Debtor Sorokine had taken a second mortgage upon her property at 16307 Valley Oak Estates without her permission, Creditor Kravtchouk confronted Debtor Sorokine and pleaded that he enter into a note affirming the ongoing validity of his Debt to her.

67. That document was subsequently recorded against the property located at 10417 Willowbrook and described in more detail in the First Amended Petition filed in St. Louis County Circuit Court and Attached as Exhibit D. See Exhibit A, p. 11 and Exhibit D.

68. The Note indicates that Debtor Sorokine will pay proceeds from the property located at 10417 Willowdale Estates upon sale of the property "towards the balance of the debt leftover from the agreement of 12/30/2003. See Exhibit A, p. 9.

69. All of the debt secured by the Willowdale Note was obtained in settlement for the non-dischargeable debt of Debtor Sorokine with respect to Creditor Kravtchouk.

70. In addition, Creditor Kravtchouk attaches to this Motion as Exhibit C an Affidavit of Michael Vigdorchik. In the Affidavit of Michael Vigdorchik, Vigdorchik testifies that Debtor Sorokine was making numerous purchases of properties on behalf of Creditor Kravtchouk to which Creditor Kravtchouk did not have knowledge. See Exhibit C, ¶ 2-6.

71. Debtor Sorokine operated in obtaining these loans based on his position within the company established by the shareholder agreement. That position entailed fiduciary obligations.

72. Further, the explicit text of the shareholders agreement indicates that Debtor Sorokine will

73. Debtor Sorokine further evidenced guilt for the debts incurred towards Creditor Kravtchouk in that he called and apologized, crying and drunk, to the son of Creditor Kravtchouk in 2014 as evidenced by the Affidavit of Ilya Kravtchouk. See Exhibit E, Affidavit of Ilya Kravtchouk.

WHEREFORE, Creditor Kravtchouk humbly requests that the Court issue an order declaring that the debts accumulated by Debtor Sorokine to Creditor Kravtchouk are not dischargeable.

Respectfully submitted,

**OTT LAW FIRM**

_____
Joseph A. Ott, #67889
Mark Blankenship, #73123
3407 S. Jefferson Avenue, Ste. 507
St. Louis, MO 63118
Telephone: (314) 293-3756
Facsimile: (314) 228-0021
*Attorneys for Plaintiff*

## CERTIFICATE OF FILING

I do hereby certify that a copy of the above and foregoing were served together with all attachments cited here in to the following parties:

**Tracy Brown** tab7@bktab.com, txmotb@sbcglobal.net; dgibson7@bktab.com;
T ABtrusteeatty@bktab.com; tbrown@ecf.axosfs.com; nevercheck999@grnail.com

**James B. Day** jdaylaw@charter.net

**William Thomas Holmes** bkty@msfirm.com, WHolmes@ecf.courtdrive.com

**Office of US Trustee** USTPRegion13.SL.ECF@USDOJ.gov

/s/ *Joseph A. Ott*
Attorney for Plaintiff